J-S42011-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BRYAN M. MONICA | : | |
| | : | |
| Appellant | : | No. 3298 EDA 2018 |

Appeal from the Judgment of Sentence Entered July 11, 2018
In the Court of Common Pleas of Montgomery County
Criminal Division at No(s): CP-46-CR-0000794-2017

BEFORE: OTT, J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY OTT, J.:                    **FILED SEPTEMBER 06, 2019**

Bryan M. Monica appeals from the judgment of sentence imposed July 11, 2018, in the Montgomery County Court of Common Pleas. The trial court sentenced Monica to an aggregate term of 25 to 50 years' imprisonment, followed by 25 years' probation, after he was convicted in a non-jury trial of committing numerous sexual offenses against his minor stepdaughter. On appeal, Monica contends the trial court erred by allowing the Commonwealth to introduce evidence of his statement to police when the interrogating detective destroyed the contemporaneous notes he took of the statement. For the reasons below, we affirm.

The facts underlying Monica's arrest and conviction are well-known to the parties and detailed in the trial court's opinion. **See** Trial Court Opinion,

_____

[*] Retired Senior Judge assigned to the Superior Court.

3/6/2019, at 1-7. Accordingly, we need not reiterate them in detail herein. In summary, the victim suffered years of sexual abuse by Monica, her stepfather, beginning when she was nine years old. In December of 2016, she confided in her best friend that she was being sexually assaulted. Approximately one month later, at the urging of her friend, the victim decided to report the abuse to her eighth grade school counselor. Before the victim left for school on January 5, 2017, Monica raped her. The victim immediately reported the abuse to her counselor, and both the victim's mother and the police were notified. *See id.* at 4-5

Monica was interviewed by police that same day, although he was not arrested or taken into custody. However, he was instructed by the police not to return to the family home. The next day, Monica appeared at the family home, armed with a handgun and threatened to shoot himself. After a five-hour standoff, Monica surrendered and was admitted to Norristown State Hospital on an emergency 302 order.[1] When Monica was released on January 12, 2017, now-retired Upper Providence Police Detective Raymond Bechtel, and Limerick Township Police Detective Ernie Morris, took him into custody. *See id.* at 5-6. Monica executed a *Miranda*[2] waiver, and was transported to the Upper Providence Police Department for an interview. Although the interview was recorded on video surveillance, there was no accompanying

---

[1] *See* 50 P.S. § 7302 ("Involuntary emergency examination and treatment authorized by a physician--Not to exceed one hundred twenty hours").

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

audio recording. Before conducting a formal question and answer session, the detectives conducted a pre-interview, during which time Detective Bechtel took handwritten notes of Monica's responses. Monica "ultimately confessed to fondling [the victim] over the years, but adamantly denied that he ever penetrated her with his penis." *Id.* at 7 (footnote omitted). When the detectives asked Monica to make a formal question and answer statement, he refused to do so. He also refused to sign Detective Bechtel's handwritten notes. At that point, the interview concluded. *See id.* Detective Bechtel testified he incorporated his notes into his formal report, which was provided to Monica during discovery, and then destroyed them, as was his standard practice. *See* N.T., 3/15/2018, at 37-42.

Monica was subsequently charged with 90 offenses, including, *inter alia*, rape, involuntary deviate sexual intercourse, indecent assault and indecent exposure,[3] for his sexual crimes against the victim, and recklessly endangering another person and carrying a firearm without a license[4] for the police standoff. The case proceeded to a non-jury trial, which began on March 14, 2018. Prior to the start of trial, Monica's counsel requested the Commonwealth turn over the detective's handwritten notes from the

---

[33] *See* 18 Pa.C.S. §§ 3121(a)(1), 3123(a)(1) and (7), 3126(a)(2), (7), and (8), and 3127(a), respectively.

[4] *See* 18 Pa.C.S. §§ 2705 and 6106(a)(1), respectively.

interview.  *See* N.T., 3/14/2018, at 3-4.  When the Commonwealth informed the court that the notes had been destroyed, the court decided to hold a hearing on the issue before determining the admissibility of Monica's statement.  The next day, Monica filed a written motion to suppress his statement to police based upon a ***Brady***[5] violation, and the court conducted an *in camera* hearing on the issue.  *See* N.T., 3/15/2018, at 5-75.  After taking testimony from both Detectives Bechtel and Norris, the trial court concluded there was no ***Brady*** violation.  Nevertheless, the court determined it would "consider what happened as spoliation of evidence" and stated it would "follow the standard instruction on spoliation that I am to believe that there is contents in those notes that would be favorable to the defendant."  ***Id.*** at 74-75.

On March 16, 2018, the trial court found Monica guilty of all 90 offenses.  The court sentenced him to an aggregate term of 25 to 50 years' imprisonment followed by 25 years' probation, on July 11, 2018.  Monica filed a timely post-

_____

[5] ***Brady v. Maryland***, 373 U.S. 83 (1963).

sentence motion on July 23, 2018,[6] which the trial court denied on October 12, 2018. This timely appeal follows.[7]

Monica's sole issue on appeal is whether the trial court "improperly allow[ed] evidence of [] Monica's statement to the police when Detective Raymond Bechtel destroyed contemporaneous notes of [] Monica's statement." Monica's Brief at 5. Monica insists the Commonwealth's failure to produce the notes violated Pennsylvania Rule of Criminal Procedure 573 ("Pretrial Discovery and Inspection"), and constituted a **Brady** violation. He maintains it was the Commonwealth's duty to preserve this evidence, which consisted of a "simultaneous recording of [] Monica's actual words of his alleged confession." **Id.** at 10-11. Instead, Monica insists the Commonwealth was permitted to "introduce an editorialized, police-rendered narrative which the police admit is basically their interpretation of what [] Monica said." **Id.**

---

[6] We note that, pursuant to Pa.Crim.P. 720, a "post-sentence motion shall be filed no later than 10 days after imposition of sentence." Pa.R.Crim.P. 720(A)(1). Because, in the present case, the tenth day fell on a Saturday, Monica had until Monday, July 23, 2018, to file a timely post-sentence motion. **See** 1 Pa.C.S. § 1908. Furthermore, we acknowledge the post-sentence motion herein was time-stamped and docketed on July 25, 2018. However, the trial court stated in its opinion that the motion was timely filed on July 23, 2018. Moreover, the motion includes a certificate of service, which indicates it was hand delivered to the trial judge on July 23, 2018. Accordingly, we will consider the motion to have been timely filed.

[7] On November 19, 2018, the trial court ordered Monica to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Monica complied with the court's directive, and filed a concise statement on December 3, 2018.

at 11.  Accordingly, he contends all evidence of his statement should have been suppressed.

When considering a **Brady** claim, we must bear in mind the following:

In **Brady**, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  **Brady**, 373 U.S. at 87, 83 S.Ct. at 1196–97.  The Supreme Court subsequently held that the duty to disclose such evidence is applicable even if there has been no request by the accused, **United States v. Agurs**, 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976), and that the duty may encompass impeachment evidence as well as directly exculpatory evidence, **United States v. Bagley**, 473 U.S. 667, 676–77, 105 S.Ct. 3375, 3380–81, 87 L.Ed.2d 481 (1985).  Furthermore, the prosecution's **Brady** obligation extends to exculpatory evidence in the files of police agencies of the same government bringing the prosecution.  **Kyles v. Whitley**, 514 U.S. 419, 438, 115 S.Ct. 1555, 1568, 131 L.Ed.2d 490 (1995); **Commonwealth v. Burke**, 566 Pa. 402, 781 A.2d 1136, 1142 (2001).

On the question of materiality, the Court has noted that "[s]uch evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  **Strickler v. Greene**, 527 U.S. 263, 280, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999) (*quoting* **Bagley**, 473 U.S. at 682, 105 S. Ct. at 3383).  The materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions.  "Rather, the question is whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'"  **Stickler**, 257 U.S. at 290, 119 S.Ct. at 1952 (*quoting* **Kyles**, 514 U.S. at 435, 115 S.Ct. at 1566).

**Commonwealth v. Lambert**, 884 A.2d 848, 853–854 (Pa. 2005).

Accordingly, "[a] **Brady** violation comprises three elements:  1) suppression

- 6 -

by the prosecution 2) of evidence, whether exculpatory or impeaching, favorable to the defendant, [and] 3) to the prejudice of the defendant." ***Commonwealth v. Paddy***, 800 A.2d 294, 305 (Pa. 2002). Furthermore, "[w]hen the [Commonwealth] fails to preserve evidence that is 'potentially useful,' there is no federal due process violation 'unless a criminal defendant can show bad faith on the part of the police.'" ***Commonwealth v. Chamberlain***, 30 A.3d 381, 402 (Pa. 2011), *quoting* ***Arizona v. Youngblood***, 488 U.S. 51, 58 (1988), *cert. denied*, 566 U.S. 986 (2012).

After an independent review of the record, the parties' briefs and the relevant statutory and case law, we find the trial court thoroughly addressed and properly disposed of Monica's claim in its opinion. ***See*** Trial Court Opinion, 3/6/2019, at 9-22 (holding: (1) Monica failed to establish a ***Brady*** violation because (a) he failed to demonstrate the detective destroyed his notes of the interview in bad faith,[8] (b) the substance of those notes was incorporated in the police report,[9] and (c) Monica failed to prove prejudice because, "[g]iven the overwhelming evidence of [his] guilt, any favorable evidence allegedly memorialized in [the detective's] handwritten notes" would not have undermined the verdict;[10] and (2) nonetheless, because the notes

---

[8] ***See*** Trial Court Opinion, 3/6/2019, at 13-14.

[9] ***See id.*** at 15-17.

[10] ***Id.*** at 17.

should have been "preserved and produced,"[11] the court applied the spoliation of evidence presumption that the notes would have contained evidence favorable to Monica). Accordingly, we conclude Monica is entitled to no relief on the sole issue he raised on appeal, and we rest on the trial court's well-reasoned basis.

Judgment of sentence affirmed. Parties are directed to attach a copy of the trial court opinion in the event of further proceedings.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/6/19

---

[11] *Id.* at 21.

# IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA
## CRIMINAL DIVISION

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | NO. 794-17 |
| | : | 3298 EDA 2018 |
| v. | : | |
| | : | |
| BRYAN MONICA | : | |

### OPINION

Branca, J.                                                                                                    March 6, 2019

## I.     INTRODUCTION

Bryan Monica ("Defendant") appeals to the Superior Court from the sentence imposed after a bench trial by this Court on July 11, 2018.[1]  For the reasons that follow, Defendant's appeal is without merit.

## II.     STATEMENT OF THE CASE

### A.     Factual History

In 2008, the minor victim ("AH") lost her biological father to a drug overdose four days before her 5th birthday.[2]  She was still in a fragile state of mourning months later when her family moved in with Defendant, who her mother had been dating.[3]  Shortly thereafter, her mother gave birth to her younger brother ("JP") who was born with cerebral palsy.  When AH was nine (9) years old, her mother married Defendant, and he soon began grooming and sexually abusing 9-year-old AH.  The family was living at 2028 Wishart Street, Philadelphia, Pennsylvania, at the

---

[1] Defendant elected to waive his right to a jury trial. [N.T. 3/6/18, at 3-21].

[2] [N.T. 3/15/18, at 200, at Ex. C-12 (Statement of Suzanne Miller)].

[3] [N.T. 3/15/18, at Ex. C-12 (Statement of Suzanne Miller,) at Ex. C-7 (Temporary PFA), at Ex. C-3K (Photographs); N.T. 3/14/18, at Ex. C-14 (CHOP Record, 1-5-17)]. The family lived with Defendant and his mother at 2836 Miller Street, in Port Richmond from August 2008 to August 2009. Defendant (DOB 7/7/87) is eleven (11) years older than victim (DOB 5/30/2003).

1

time when AH first recalled Defendant's sexual advances.[4] AH's mother, consumed with the around-the-clock special care needs of JP was unaware of the abuse until AH's January 5, 2017 report to her school counselor some 4 years after the abuse began. Moreover, in light of the physical, psychological, and emotional care-taking demands on her mother, AH had little option but to look to Defendant for her own support; further exacerbating her vulnerability and the power imbalance that Defendant seized upon for his own selfish and destructive gratification.

During this period, Defendant first began taking advantage of AH, mostly late at night while her mother was asleep, leaving the two alone in the living room watching TV. While seated on the right side of the couch with his penis exposed, Defendant would position her, facing away from him on his lap, and moving her back and forth in a manner that allowed his penis to rub between her exposed buttocks.[5] Soon, Defendant began entering AH's bedroom late at night. AH recalled that she could always hear Defendant's approach as he headed for her bedroom door because the floor boards outside her bedroom creaked under his towering 6'5", 200lb frame.[6] Once inside her room, Defendant would rub her labia and vagina with his fingers and hand. Paralyzed by fear, AH pretended to be asleep during these incidents.

In the years that followed, Defendant continued to prey on AH while they were alone; either while watching TV in the living room or late at night by sneaking into her bedroom after she had gone to bed. The abuse escalated further and Defendant's sexual assaults began to cause AH to suffer vaginal pain. On these occasions, Defendant forced AH to bend over the back of the living room couch, and pulling down her pants and underwear and his own boxers would

---

[4] [N.T. 3/15/18, at Ex. C-12 (Statement of Suzanne Miller) (The family lived at 2028 Wishart Street from August 2009 until August 2015.); [N.T. 3/16/18, at 19, 22] (Defendant's conduct during this period supported Counts 49, 50, and 51 (Indecent Assault of Person Less than 13 Years of Age).

[5] For purposes of categorization, the Commonwealth referred to these incidents as the "couch-sitting incidents." [N.T. 3/16/18, at 15-32].

[6] [N.T. 3/15/18, at 200, at Ex. C-7 (Temporary PFA)].

then, as she described, 'pound' his penis against her labia and vagina; causing her to suffer vaginal pain. Defendant also assaulted her in this 'pounding' manner in her bedroom after she had gone to bed, while she was lying in her bed; again, causing her to suffer vaginal pain.

When AH was 12 to 13 years old, her family moved from Philadelphia, first to 428 Nottingham Lane, in Collegeville, Montgomery County, and later to 221 Masters Drive, in Pottstown, Montgomery County.[7] At this point, Defendant began forcing her to engage in oral sex; both fellatio and cunninglingus. On one such particular occasion, AH feigned sleep to ward off Defendant's impending assault. Undeterred, Defendant forcibly pried her mouth open to insert his penis. She tried to resist by keeping her mouth shut, but Defendant ultimately succeeded in inserting his penis into her mouth. After Defendant had ejaculated, he immediately exited the room, leaving the victim, disgusted, to use her own clothing to wipe his semen from her face and body. Nearly every night during this same time period, when Defendant entered her room and pounded his penis on her vagina, he also began performing oral sex on her, which she recalled as a feeling of disgusting wetness.

There were other incidents too, when Defendant opportunistically used AH's vulnerability and reliance on him (for transportation) and the privacy and isolation his car provided, as a forum to prey on the victim. AH recalled one specific occasion, late at night around Halloween, when she was in Defendant's car and he forced her to fondle his exposed penis by rubbing her hand back and forth.

Another time, Defendant lured AH into his vehicle, a black 2012 Chrysler 300 with tinted windows, under the guise of giving her a ride to buy her friend a Christmas gift, only to expose his penis once they were in the car. AH tried to ignore Defendant's exposed state, but Defendant

---

[7] [N.T. 3/15/ 18, at Ex. C-12 (Statement of Suzanne Miller) (The family lived at 428 Nottingham Lane in Collegeville from August 2015 until September 2016, when they moved to 221 Masters Drive in Pottstown; where they lived on January 5, 2017, when AH reported Defendant's abuse to her school counselor.)

3

escalated his assaultive tactics and demanded she perform oral sex on him, telling her three times to "suck it." When she refused, telling him "no," he manipulatively and derogatorily told her, "don't be a bitch."

In addition to being painfully aware of the financial stability that Defendant, as the bread-winner, brought to her family's life, and afraid of her half-siblings losing their dad, (a loss all too familiar to her) the inevitable repercussions her report would have on her younger siblings and mother, AH told no one of the abuse she bore for years, until approximately one month before her January 5, 2017 report to her school counselor, when she disclosed Defendant's abuse to her best friend, minor CK.[8] And only when CK threatened to report Defendant's abuse, did AH finally resolve to come forward in hopes of protecting her two-year old half-sister from ever having to suffer a similar fate at Defendant's hands. AH, in fact, was so scared about what might happen once she disclosed the abuse that she had actually packed her bag before leaving that January 5, 2017 morning, out of concern she would not be able to return home to her mother after her disclosure.

On that Thursday morning, January 5, 2017, when AH had already resolved the night prior that she would go to school and report the abuse, Defendant forcibly raped her. Defendant had awoken her because she was late for school and she frantically looked over to see that it was 7:10am. While she was still in bed, Defendant struggled to untie her pants, and then got on top of her and forced his penis inside of her vagina. She vividly recalled that the pain she felt was so unbearable that she had turned her face into her pillow and almost cried. When Defendant finished, AH had no time to change her underwear before he drove her to school, and she immediately reported Defendant's sexual abuse spanning the last 4 plus years of her life to her counselor at Spring Ford Eighth Grade Center. Principal Jennifer Rineheimer, a mandatory

---

[8] [N.T. 3/14/18, at 200, at Ex. C-5 (Statement of CK)].

4

reporter was immediately notified and initiated a ChildLine Report, her mother was called, and Upper Providence Police Department Detective Raymond Bechtel ("Det. Bechtel") and Limerick Township Police Department Detective Ernie Morris ("Det. Morris") responded accordingly.[9] AH was taken to The Children's Hospital of Philadelphia (CHOP) for collection of any remaining forensic evidence from Defendant's sexual assault that morning.[10] DNA evidence collected by CHOP's trained rape crisis medical professionals from AH's right thigh, vulva, as well as her underwear, confirmed Defendant could not be excluded as a DNA contributor.[11] Ultimately, AH provided an hour-long interview to Mission Kids, wherein she at length, relayed in excruciating detail the sexual abuse she suffered beginning at age 9 and continuing for the following four (4) years at Defendant's hands. And when asked how often Defendant abused her sexually, she responded "too many to count . . . almost every night, and mostly on weekends. . . . In a seven day week, he would do it six times."[12]

Defendant was also called to the school that day, but had no contact with AH, as detectives met him in the school parking lot, and invited him to the Limerick Township Police Department for an initial interview.[13] Defendant went of his own volition, drove his own vehicle to the station, and was repeatedly informed that he was not in custody and was permitted to leave at any time. Defendant remained to answer detectives' questions, but decided to depart when they asked that he complete a voice recognition test. Before leaving, detectives made it clear that Defendant was not to return to the family home that evening, and would need to find alternative accommodations. Knowing that no one was home because AH and her other family members

---

[9] [N.T. 3/14/18, at 144-153; 153-175; N.T. 3/15/18, at 135-36]. Based on AH's report, involving both police department's jurisdictions, the Detectives commenced a joint investigation.

[10] [N.T. 3/14/18, at 200, at Ex. C-14 (CHOP Record, 1-5-17)].

[11] [N.T. 3/15/18, at C-22, (DNA Analysis Report)].

[12] [N.T. 3/14/18, at 40-128; 3/15/18, at Ex. C-3K, C-3L, C-3M].

[13] [N.T. 3/15/18, at 137].

were at CHOP for the collection of evidence, detectives escorted Defendant to the home to collect some belongings. At some point after his interview that evening, Defendant sent a text from an unknown number to AH's mother, stating "I am a green belt."[14] While vague and seemingly innocuous, AH's mother immediately recognized the messages as being from Defendant.[15]

The following day, on January 6, 2017, upon realizing the gravity of the unfolding events, Defendant, armed with a loaded .40 handgun, orchestrated a police standoff outside of the family home on 221 Masters Drive, in Pottstown, repeatedly threatening to shoot himself. As law enforcement arrived on the scene, however, Defendant called AH's mother from the same number that she received the "I am a green belt" text the night before, and left a 25 second voicemail saying, "I am sorry. Tell [AH] I am sorry, and tell the kids I love them."[16] Thereafter, Defendant held local law enforcement at bay and forced neighboring communities onto lockdown from approximately 3pm until 8pm before surrendering to officers and crisis communicators on the scene.[17] Upon surrender, Defendant was immediately transported to Montgomery County's Norristown State Hospital - Building 50 where he was admitted on an emergency 302 order.

On January 12, 2017, upon learning Defendant's release was imminent, Det. Bechtel and Det. Morris took Defendant into custody as he was preparing for discharge from Building 50.[18] The detectives immediately administered Miranda Warnings; which Defendant executed at

---

[14] [N.T. 3/15/18, at 168-68, at Ex. C-9 (Screenshot)].
[15] [N.T. 3/15/18, at Ex. C-12 (Statement of Suzanne Miller)].
[16] [N.T. 3/15/18, at 171-200, at Exs. C-10 (Screenshot,) C-11 (Audio of Voicemail,) C-12 (Statement of Suzanne Miller)].
[17] [N.T. 3/15/18, at 147-48].
[18] [N.T. 3/15/18, at 135, 148, 161].

6

12:15pm in the parking lot of the Norristown State Hospital.[19] After indicating he understood his rights, Defendant agreed to waive those rights, and speak to the detectives; at which point he was transported to the Upper Providence Police Department for an interview.[20] A short time later, after arriving at the station, the detectives led Defendant to the interview room which is under constant video surveillance, providing him with a soda as he had requested when offered, and then began their "pre-interview" of him at approximately 12:50pm, during which Defendant ultimately confessed to fondling AH over the years, but adamantly denied that he ever penetrated her with his penis.[21] The detectives intended to then take a formal written question and answer statement but when asked to do so, Defendant refused.[22] Thereafter, Defendant was asked to sign Det. Bechtel's notes which he also refused. At that point the interview was concluded and Defendant was processed.

On Bill of Information 794-17, the Commonwealth charged Defendant Count One (Rape/Forcible Compulsion,) Count Two (Attempted Rape/Forcible Compulsion,) Count Three (Statutory Sexual Assault/Victim Less than 16 years old,) and numerous related offenses.[23] Ultimately, the Commonwealth proceeded to trial on Counts 1-4, 16-17, 27, 29-31, and 49-54; and moved to withdraw Counts 55-58, 72-79, and 89.[24]

### B.  Procedural History

On March 14, 2018, the parties convened before the undersigned for trial and disposition of preliminary matters, including Defendant's underlying discovery due process claim instantly

---

[19] [N.T. 3/15/ 18, at Ex. C-23 (Constitutional Warnings)].

[20] [N.T. 3/15/18, at 148-49].

[21] [N.T. 3/15/18, at 150-55, at 200, Ex. C-25 (Video)].

[22] [N.T. 3/14/18, at 20].

[23] [Bill of Information 794-17 (5/8/17)] (Ninety (90) Counts *in totum).*

[24] [N.T. 3/14/18, at 28-29].

7

on appeal; discussed at length *infra*.[25] During closing arguments, on March 16, 2018, Defense Counsel advised the Court that Defendant would admit guilt to Count 29 (Endangering the Welfare of a Child,) Count 30 (Corruption of Minors,) Count 31 (Firearms Not to be Carried Without a License,) Counts 52-58 (Indecent Exposure,) and Counts 72-79 (Indecent Assault of a Person Less Than Sixteen).[26] The Court found Defendant guilty of all Counts.[27]

On July 11, 2018, the undersigned conducted a sentencing hearing at which the Commonwealth introduced evidence consisting of victim impact statements from AH, her mother, and Principal Rinehimer as to the pernicious and devastating effect of Defendant's abuse.[28] Thereafter, Defendant knowingly, intelligently, and voluntarily waived his right to allocution, opting instead to introduce a letter he had written to the Court which evidences Defendant's total lack of understanding of the depravity of his actions, and lack of remorse for the lifelong effects of his depraved acts.[29] At the hearing's conclusion, having previously reviewed Defendant's Presentence Investigation (PSI) report, and after reading Defendant's letter, the Court sentenced Defendant to an aggregate of twenty-five (25) to fifty (50) years on the underlying charges including, Rape, Criminal Attempt Rape, Statutory Sexual Assault, as well as other related offenses; and twenty-five (25) years of consecutive probation, no contact with the victim or minors.[30]

On July 23, 2018, Defendant filed a timely "Motion to Reconsider Sentence."[31] After October 12, 2018 argument on Defendant's Motion, the Court denied the Motion on the record;

---

[25] [N.T. 3/14/18, at 3-26; N.T. 3/15/18, at 3-75].
[26] [N.T. 3/16/18, at 10-11]; 18 Pa. C.S. §§ 4304(a)(1), 6301(a)(1)(ii), 6106(a)(1), 3127(a), and 3126(a)(8).
[27] [N.T. 3/16/18, at 33-34]. Upon request, the Court revoked Defendant's bail, and remanded Defendant without bail.
[28] [N.T. 7/11/18, at 17-31, at Ex. C-1 (Victim impact Statements)].
[29] [N.T. 7/11/18, at 30-31, at Ex. D-1 (Letter of Defendant)].
[30] [N.T. 4/11/18, at 36, Ex. D-1 (Post Sentence Rights Form)].
[31] For purposes of Pennsylvania Rule of Criminal Procedure 720(A)(1), the tenth day was a Saturday, so Defendant's filing on Monday, July 23, 2018 is timely.

further memorialized by Order of the same date.[32]  On November 9, 2018, Defendant timely filed a Notice of Appeal challenging the imposition of his sentence.  On December 3, 2018, upon the Court's request and pursuant to Pa. R.A.P. 1925(b), Defendant filed a "Concise Statement," asserting the following issue for review:

> 1.      The defendant made a statement to Detective Raymond Bechtel and Detective Ernie Morris during which Detective Raymond Bechtel took pages of notes.  Detective Bechtel asked the defendant to sign the notes as a written Q and A statement but the defendant declined.  Detective Bechtel later destroyed those notes.  There were inculpatory as well as exculpatory information contained in those notes of the defendant's statements.  The Court abused its discretion and misapplied the law when it admitted evidence of the defendant's above-referenced statement in light of the Brady violation inherent in Detective Bechtel destroying his notes.

## III.   DISCUSSION

Defendant's single claim on appeal is based upon Det. Bechtel's failure to preserve the handwritten notes that he took on January 12, 2017, during Defendant's pre-interview at the Upper Providence Police Department.  In addition to claiming these notes constituted mandatory discovery material, Defendant claims that Det. Bechtel's handwritten notes included *Brady*[33] material, the destruction of which so gravely prejudiced Defendant that dismissal was required.[34]

Initially, despite express reference in Det. Morris's timely provided police report ("Report by Ernie Morris,) reflecting that Det. Bechtel was taking "notes," Defendant did not assert the instant issue until the morning of the first day of trial.[35]  More specifically, on March 6,

---

[32] [N.T. 10/12/18, at 1-11].

[33] *Brady v. Maryland*, 373 U.S. 83 (1963).

[34] Pa. R. Crim. P. 573. Arguably, Defendant waived any alleged *Brady* claim for dismissal of the charges when he posited that the Court had three options at its disposal. [N.T. 3/15/18, at 65] ("So I would suggest to Your Honor that you have three choices here. I think in my memo I lay out the three choices, and it's up to Your Honor to decide. Whether you think it's a Brady evaluation, whether you think it's spoliation, or whether you think it's a violation of the Best Evidence Rule. I'll leave it to Your Honor's discretion.") Nonetheless, given the nature of the case and its severe consequences on all involved, the Court will address the issue as set forth in Defendant's 1925(b) Statement.

[35] [N.T. 3/14/18, at 3-5; 3/15/18, at p. 42 of 68 of Ex. C-24 (Report by Ernie Morris) ("I did ask MONICA if he would sign off on the notes that Detective Bechtel was taken [*sic*].")] (emphasis added)]. The Commonwealth represents

2018, upon Defense Counsel's request, the Commonwealth re-produced the video it asserts it had previously timely provided during discovery.[36] As indicated, on the morning of trial, Defense Counsel explained how she first became aware of the underlying issue, as follows:[37]

DEFENSE COUNSEL: My matter involves discovery and the disclosure of discovery in this case. I think the most important one is, last week I received a video of my client's statement; it did not have audio in it. And I did watch the video that was provided, and in it I saw one of the officers taking notes about my client's statement. And I did request, in my written discovery request, any contents about my client's statement. The Commonwealth has represented they've been ready on this case. I don't know if they've watched the video, but I should be entitled to those notes. What I have been given is a characterization of what he said, and it's not a straight question-and-answer statement. What I have is snippets of my client's statement. So I need those notes to proceed.

THE COURT: Where are the notes?

THE COMMONWEALTH: I don't have the notes. Nor does detective Bechtel. It is well documented in the report - - that's about 60-some pages -- that notes were taken. The defendant was asked to sign those notes. Because he did decide to decline to give a Q & A, those notes were being taken during the initial conversation between detective Ernie Morris and detective - - at the time - - Ray Bechtel. He did decline to give a formal Q & A. Those notes were used to formulate the reports that have been turned over. They detail, in pretty lengthy detail, the notes from that conversation. I did request them, because I wanted to see them as well. It is my understanding that those have been destroyed, pursuant to common course and practice, that after the report is developed that those are destroyed, pursuant to common course and practice, that after the report is developed that those are destroyed.

THE COURT: Whose common course and practice is it to destroy notes of a statement of a defendant?

that "[i]n conference, . . . [Defense Counsel] . . . accepted responsibility on behalf of the office that this discovery [Ex. C-25] could have been previously past [sic] and lost by the previously assigned attorney." [Mot. To Strike Def.'s Omnibus Pre-Trial Brief, at ¶ 7.]

[36] [Mot. To Strike Def.'s Omnibus Pre-Trial Brief, at ¶ 5-7]; [N.T. 3/6/18, at 19-20; N.T. 3/15/18, at 200, Ex. C-25 (Video)].

[37] [N.T. 3/14/18, at 3-5].

10

THE COMMONWEALTH:        Well, Your Honor, it wasn't a statement of a
defendant. It was - -

. . .

It was preliminary notes - -

. . .

Your Honor, it was my understanding that these were
not in any way a Q & A form. It was notes being
taken about the preliminary conversation; so that when
a formal Q & A was taken, that they could reflect back
to certain topics, to then ask the defendant specifically
about those things. It is my understanding they were in
no way verbatim - -

On March 15, 2018, Defendant filed a "Motion to Suppress Following A *Brady*

Violation,*" memorializing her oral motion made the day before, and asserting therein that the

Commonwealth violated Pa. R. Crim. P. 573's mandatory disclosure requirements, and

additionally, committed a *Brady* violation by depriving Defendant the opportunity to examine

Det. Bechtel's handwritten notes taken during Defendant's interview, which at one point

Defendant was asked to adopt, but refused.[38] The Court proceeded, upon agreement of the

parties, to conduct an *in camera* hearing to explore Defendant's allegations regarding Det.

Bechtel's destruction of his handwritten notes. After a lengthy examination of Det. Bechtel by

the Commonwealth, Defense Counsel, and the undersigned, the Court determined that Defendant

had failed to carry his burden of demonstrating that the detectives acted with the requisite bad

faith necessary under the circumstances to establish that a *Brady* violation occurred.[39]

The standard of review applied to claims raised on appeal is limited to determining

whether the trial court abused its discretion or committed an error of law. *See Commonwealth v.*

*West,* 937 A.2d 516, 521 (Pa. Super. Ct. 2007). In evaluating a trial court's decision, an "abuse

---

[38] In the alternative, Defendant claimed that admission of Det. Bechtel's report violated Pa. R. E. 1002, commonly
referred to as the 'best evidence rule;' which has been abandoned on appeal.

[39] *See Arizona v. Youngblood,* 488 U.S. 51, 58 (U.S. 1988); *see also Commonwealth v. Harrell,* 65 A.3d 420, 428–
29 (Pa. Super. Ct. 2013).

11

of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Commonwealth v. Greer*, 951 A.2d 346, 355 (Pa. 2008) (internal quotation omitted).

In *Brady*, the Unites States Supreme Court held that the suppression of "evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83 at 87 (1963); *United States v. Agurs*, 427 U.S. 97, 103–04 (1976), *holding modified by United States v. Bagley*, 473 U.S. 667 (1985) (Clarifying *Brady* material includes exculpatory and impeachment evidence.); *Commonwealth v. Wallace*, 455 A.2d 1187, 1190 (Pa. 1983). The burden rests with the defendant to "prove, by reference to the record, that evidence was withheld or suppressed by the prosecution." *Commonwealth v. Haskins*, 60 A. 3d 538, 547 (Pa. Super. Ct. 2012).

**A.  Defendant Failed To Establish a *Brady* Violation For Multiple Attendant Reasons:**

i.  *No Bad Faith Demonstrated As Required When The Subject Evidence Is Destroyed By Police;*

ii.  *Notes Were Destroyed Prior To Being Turned Over To Commonwealth Attorney And Any Request For Discovery & Substance of Notes Was Provided To Defendant In Police Reports; and*

iii.  *Defendant Was Not Prejudiced By The Destruction of The Notes.*

To establish a *Brady* violation, a defendant must demonstrate the following three components: 1.) the evidence at issue must have been suppressed by the State; (2) that evidence must be favorable to the accused, either because it is exculpatory, or because it is impeaching; and (3) prejudice must have ensued." *Commonwealth v. Weiss*, 81 A.3d 767, 783 (Pa. 2013); *Commonwealth v. Lambert*, 884 A.2d 848, 854 (Pa. 2005); *Commonwealth v. Haskins* 60 A.3d

12

538, 545 (Pa. Super. Ct. 2012) (internal citation omitted). To determine whether a defendant has been prejudiced the court must analyze the materiality of the information at issue. "In engaging in this analysis, a reviewing court is not to review the undisclosed evidence in isolation, but, rather, the omission is to be evaluated in the context of the entire record." *Commonwealth v. Chamberlain*, 30 A.3d 381, 410 (Pa. 2011). Further, the "mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, at 109-110 (1976). The Pennsylvania Supreme Court has reaffirmed that the concept of materiality goes beyond the idea that the disputed material might have made a difference at trial.

> "The law governing alleged *Brady* violations is well-settled. In *Brady*, the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution.
>
> . . .
>
> On the question of materiality, the Court has noted that such evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. The materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. Rather the question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

*Commonwealth v. Lambert*, 884 A.2d 848, 853-55 (Pa. 2005) (internal citations omitted).

    *i.*  *Defendant Failed To Establish The Requisite Bad Faith.*

The U.S. Supreme Court and our Courts have held, however, that where interview notes are destroyed, such that a defendant is severely handicapped, if not denied completely, the opportunity to establish the *Brady* character of that evidence, and ensuing prejudice, the Court's inquiry is limited to determining whether police acted in bad faith. *See Arizona v. Youngblood*, 488 U.S. 51, 58 (U.S. 1988) ("[U]nless a criminal defendant can show **bad faith** on the part of

13

the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."); *Commonwealth v. Harrell*, 65 A.3d 420, 428–29 (Pa. Super. Ct. 2013) (No *Brady* violation where defendant claimed that police acted in bad faith by failing to record his interrogation and confession, thereby denying him the ability to establish confession was involuntary and instead, a product of police coercion.); *see Commonwealth v. Feese*, 79 A.3d 1101- 11 (Pa. Super. Ct. 2013), *as corrected* (Jan. 16, 2014) (No *Brady* violation where defendant failed to establish that OAG's destruction of interview notes and proffer statements prepared by agents was in bad faith, in spite of express policy requiring preservation of same.)

In light of Defendant's failure to demonstrate Det. Bechtel destruction of his notes was in any way attributable to bad faith, the Court properly denied Defendant's *Brady* claim and concomitant request for relief in the way of dismissal of the charges. Essential to its disposition of the underlying issue, was the Court's finding that Det. Bechtel testified credibly. More specifically, he testified that his standard practice for 26 years as taught to him at the police academy was to destroy his notes after he transposed their contents to a written report; and he further added as to his lack of bad faith in failing to preserve his handwritten notes:[40]

> I have a habit of being as possibly detailed as I can be, and as being as fair and as honest as I can be, my entire career. So if there is anything that the defendant would have said that implicated him in a crime, or did not, or was a potential alibi, or was anything at all, my job - - and I felt this in my heart throughout my entire career - - is to get to the truth of the matter, to have real justice service. If somebody didn't do something, I don't want them to get in trouble for that. If they did, then if they face charges, they face charges. My job with my report writing is to be as accurate as possible and show the truth as it happened.

---

[40] [N.T. 3/15/18, at 58].

*ii. Notes Were Destroyed Prior To Being Turned Over To The Commonwealth Or Any Request For Discovery & Their Substance Was Provided To Defendant In Police Reports.*

As noted, Det. Bechtel confirmed that he destroyed his notes the same day that he had written them after he had incorporated them into his formal report which was his standard protocol for his entire 26-year career in law enforcement, as taught to him at the police academy.[41] This testimony, coupled with the above-quoted testimony which the Court found credible clearly established that the notes were never turned over to the District Attorney and no longer in existence when sought by Defendant in discovery but the police reports set forth at length the substance of the notes which included both inculpatory and exculpatory statements of Defendant.[42]

In *Commonwealth v. McElroy*, the Court vacated the trial court's grant of sanctions against the Commonwealth after police erased, destroyed, or failed to turn over witnesses' tape-recorded interviews, after determining that the tapes were destroyed by police *before* any request that they be turned over to the Commonwealth, and additionally because the substance of which was incorporated into a report by police provided to defendant. *Commonwealth v. McElroy*, 665 A.2d 813 (Pa. Super. Ct. 1995) (Applying predecessor rule, Pa. R. Crim. P. 305, and concluding where evidence had been destroyed by police, Commonwealth could not be sanctioned for failure to turn over it in discovery.); *see also Commonwealth v. Wright*, 433 A.2d 511, 513 (Pa. Super. Ct. 1981) (Holding no destruction of evidence actually occurred because the Commonwealth never had the notes at issue in its possession.) The Superior Court held that its

---

[41] [N.T. 3/15/18, at 29-59].

[42] [N.T. 3/15/18, at 67-68, at 200, Ex. C-24] (Discussing *Commonwealth v. Pickering*, 533 A.2d 735 (Pa. Super. Ct. 1987)).

denial of any *Brady* claim was controlled by its earlier decisions in *Commonwealth v. Pickering*,[43] and *Commonwealth v. York*,[44] which are likewise controlling here:

> In *Pickering, supra,* an undercover police officer made notes of drug transactions between herself and the appellant. The officer used these notes to prepare her written reports which were made available to the appellant's counsel. After preparation of the reports, she destroyed the notes. The appellant contended on appeal that the Commonwealth's failure to produce the officer's notes denied him the right to confrontation under the sixth amendment to the United States Constitution and article I, section 9 of the Pennsylvania Constitution. The appellant argued that the notes were relevant and that, without them, he was unable to effectively cross-examine the witness. This court, citing *Commonwealth v. York, supra,* stated that **destruction of a police officer's notes violates a defendant's right to confrontation only if the Commonwealth suppressed the evidence *following* a request for discovery of same by the defense. We also held that where the notes were substantively incorporated into the police report, they would have been merely cumulative of that report had they been produced.**
>
> . . .
>
> In *Commonwealth v. York, supra,* an undercover police officer tape recorded details of her drug transactions with the appellee immediately following each purchase. She used these recordings to prepare her police reports. Once the reports were prepared, she recorded over the prior recordings, thus erasing the latter. The officer testified at the appellee's preliminary hearing that she had used the tape recorded notes to prepare her police reports.
>
> . . .
>
> This court held that a *Brady* violation occurs when the evidence sought is not only material and favorable but where the Commonwealth also suppressed the evidence following a defense request for same. It concluded:
> In the instant matter there is no evidence that the prosecutor suppressed or destroyed the tapes. On the contrary, testimony from the suppression hearing reveals that [the officer] obliterated the tapes by using them for further recording. This court then stated that the Commonwealth never had the chance to see the tape recordings, much less to suppress them.

*McElroy*, 665 A.2d at 819-820 (internal citations omitted).

As a necessary corollary to this analysis regarding the import of the destroyed notes having some impeachment value, the testimony of the detectives and the police reports themselves together establish that Det. Morris's Report was more than sufficient to provide

---

[43] 533 A.2d 735 (Pa. Super. Ct. 1987).

[44] 465 A.2d 1028 (Pa. Super. Ct. 1983).

16

impeachment material for cross-examination had the detectives testified inconsistent with the report's recitation of the pre-interview.

### iii. No Prejudice Ensued.

Given the overwhelming credible evidence of Defendant's guilt, any favorable evidence allegedly memorialized in Det. Bechtel's handwritten notes could not reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *See Commonwealth v. Lambert*, 884 A.2d 848, 853-55 (Pa. 2005).

In *Commonwealth v. Willis*, the Pennsylvania Supreme Court held that interview notes that could have been used for impeachment purposes by defendant were not material as no reasonable probability existed that the trial outcome would have been different. Likewise, here, even without the testimony of the detectives as to statements of Defendant, the credible, detailed, gut-wrenching testimony of AH (alone more than sufficient to support the Court's verdict),[45] bolstered by the testimony from CK, and AH's Principal as to AH's recitation of the underlying sexual abuse, coupled with Defendant's own admissions as captured in the voicemail message he left on his wife's cell phone, and the evidence demonstrating his own consciousness of guilt in staging a nearly 5-hour standoff with police while, at times, holding a gun to his head, presented this Court with more than ample evidence to support its verdict. *See Commonwealth v. Martuscelli*, 54 A.3d 940, 947 (Pa. Super. Ct. 2012) (The trier of fact is free to believe all, some, or none of the testimony presented and the appellate court is precluded from reweighing the evidence and substituting its own judgment for that of the finder of fact.). "*Commonwealth v. Hopkins*, 747 A.2d 910, 914 (Pa. Super. Ct. 2000) (internal citations omitted)("If the factfinder reasonably could have determined from the evidence adduced that all of the necessary elements

---

[45] [N.T. 3/14/18, at 40-128; 3/15/18, at Ex. C-3K, C-3L, C-3M].

17

of the crime were established, then that evidence will be deemed sufficient to support the verdict.").

Our Pennsylvania Supreme Court most recently examined an asserted *Brady* violation, and despite its determination that favorable evidence had, indeed, been suppressed, the Court ultimately held that the violation was not prejudicial in light the overwhelming evidence of defendant's guilt. *Commonwealth v. Natividad*, - - A.3d - - , 743 CAP, 2019 WL 286564, at *16 (Pa. Jan. 23, 2019). More specifically, the Court stated:

> We need not belabor our discussion of whether appellant has satisfied the first two components of *Brady*: without a doubt, the trove of statements and investigatory paperwork revealed during the federal discovery process were suppressed by the government and favorable to appellant. There is no dispute the Commonwealth failed to disclose these materials to the defense prior to trial,[16] and some of them were plainly exculpatory on their face, as they identified an alternate suspect who allegedly claimed responsibility for the murder. *Brady*'s first two requirements are therefore clearly satisfied.

It further expounded, however, that "it is not enough, for purposes of establishing materiality under *Brady*, to simply allege that the withheld evidence may have opened the door to an otherwise unavailable defense theory, or to challenge the completeness of the police investigation." *Id.* at *22. Emphasizing, instead, that "the linchpin of materiality is whether there exists a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Id.* The Court then concluded that the withheld evidence did not undermine confidence in the jury's verdict, as no reasonable probability exists that the result of defendant's trial would have been different had the evidence been disclosed. *Id.* at *21. Without question, the circumstances in this case fall far short of the likes of that which transpired in *Natividad* which clearly reinforces that, in Pennsylvania, the bar to establish prejudice for a *Brady* violation is extremely high.

18

In short, even assuming Defendant had carried his initial burden of demonstrating the first two prongs of a *Brady* violation (an unfounded proposition), he has woefully failed to prove the most crucial third prong that he suffered prejudice. Thus, a *Brady* violation has not been established. *See Lambert*, 884 A.2d at 854; *see also, Weiss*, 81 A.3d 767. And most certainly Defendant did not establish any Commonwealth misconduct justifying dismissal of the charges.

Relying on *Commonwealth v. Adams*, 177 A.3d 359 (Pa. Super. Ct. 2017), Defendant claimed that Det. Bechtel's destruction mandated dismissal of Defendant's charges. *Adams*, however, is unavailing to Defendant as it: was handed down by the Superior Court nearly a year after the notes at issue in this case were destroyed; is distinguishable in several key aspects; and did not require dismissal despite a clear *Brady* violation. In *Adams*, after mistrial, defendant moved for dismissal of his charges based on prosecutorial misconduct, asserting retrial would violate double jeopardy. Contrary to the alleged evidentiary claim at issue here, where even excluding entirely any evidence of Defendant's statements to Dets. Bechtel and Morris, the credible evidence admitted at trial overwhelmingly established Defendant's guilt beyond a reasonable doubt, the alleged malfeasance in *Adams* was much more egregious and highly prejudicial.

In *Adams*, despite having appropriately sought, pursuant to Pa. R. Crim. P. 573, "[a]ny evidence favorable to the accused which is material either to guilt or to punishment, and which is in the possession of the attorney for the Commonwealth," and "[a]ll written or recorded statements, and substantially verbatim oral statements, made by co-defendants and by co-conspirators or accomplices, whether such individuals have been charged or not," police deleted, destroyed, and withheld *Brady* material, as conceded by the First District Attorney of Warren County ("the FDA") prosecuting the case. *Id.* at 367. In that case, the FDA actually discovered during trial "evidence [which had been sought but not turned over to defendant] in a police file,

including a statement made by the defendant, and an exculpatory statement made by the Commonwealth's chief witness." *Id.* at 373.

More specifically, at the hearing on defendant's motion to dismiss the charges against him, the police corporal ("the Crpl") assigned to the case admitted, that:

> [W]hile polygraph examiners are not required to record their examinations, he records 99.9% of his polygraph examinations, and that this was common knowledge in the Warren barracks. [The Crpl] . . . would typically make a copy of the video recording, print the accompanying test results, and keep them both secured in a closet in his office. A supplemental report regarding the polygraph would be given to a supervising officer and attached to the police investigation report, which would eventually be given to the prosecutor on the case. [The Crpl] . . . testified that he would enter a recorded statement into case evidence *only if* the statement had "evidentiary value"—that is, when it contained a confession.

*Id. at 366* (emphasis added). Furthermore, and contrary to the express terms of the specific applicable state police administrative regulations governing polygraph examinations, mandating preservation of polygraph audio and/or video recordings, the Crpl testified that "he was 'mistaken' for failing to comply with the regulation, but that he does not enter every recorded statement into evidence 'only for the sheer fact [the investigating officers] have to eventually account for this, dispose of it. And, it becomes a *thorn in their side.*'" *Id.* Even after the resulting mistrial and related attempts to disabuse the Crpl of his skewed interpretation of the applicable polygraph preservation policy, he somewhat perplexingly maintained that while now, "if he records a polygraph examination, he includes that information in his report. He *still does not put the recording into case evidence unless it includes a confession, or unless it is specifically requested.*" *Id.* at 366.

Bolstering his assertion that the *Brady* violation was not a result of bad faith, the FDA clarified that "his office sometimes has had difficulty obtaining discovery from law enforcement agencies in Warren County, and that this issue has been addressed repeatedly at meetings between the District Attorney's office and chief law enforcement officers." *Id.* at 367. The FDA

20

admitting knowing of "only one discovery violation which led to a mistrial, and other cases in which discovery was provided late," emphasizing that "none of the discovery violations were intentional." *Id.* at 367. Ultimately, despite its determination that failures on the part of both the police and the prosecutor precipitated a *Brady* violation and mistrial, the Superior Court held that such misconduct constituted an insufficient basis upon which to dismiss defendant's charges. As demonstrated, *Adams* addressed a far more systemic issue than that presently at hand, and yet the Superior Court concluded dismissal as too draconian a remedy.

## B. The Court Imposed An Appropriate Sanction For The Destruction of The Notes As A Discovery Violation.

Though not a *Brady* violation, the Court did find that the notes, (which were sufficiently detailed and contained some direct quotes of Defendant such that the detectives asked Defendant to adopt and sign them) should have been preserved and produced as a matter of fundamental fairness in preparing the case for trial.[46]

In its exercise of discretion, this Court remedied the destruction of the notes by applying the presumption that the notes contained evidence favorable to Defendant. *See Commonwealth v. Coon,* 26 A.3d 1159, 1164-65 (Pa. Super. Ct. 2011) (missing-evidence instruction, equivalent to spoliation instruction, charges defendant is entitled to inference that missing evidence would have proven unfavorable to the Commonwealth, and held unwarranted on direct appeal.) (referencing *Commonwealth v. Coon,* 964 A.2d 432 (Pa. Super. Ct. 2008) (unpublished memorandum op. affirming sentence); *see also Commonwealth v. Ward,* 188 A.3d 1301, 1308 (Pa. Super. Ct. 2018), *appeal denied,* 199 A.3d 341, 1306-1307, n.2 (Pa. 2018) (Affirming

---

[46] Even the Assistant District Attorney wanted Det. Bechtel's missing notes for trial [N.T. 3/14/18, at 3-5]; *see Commonwealth v. McElroy,* 665 A.2d 813, 820 (Pa. Super. Ct. 1995) (Concluding that "the Commonwealth never had the chance to see the [destroyed] tape recordings, much less to suppress them."). *See Commonwealth v. Shelton,* 536 Pa. 559, 564- 65 (Pa. 1994) ("It is well established in this Commonwealth that the purpose of the discovery rules is to permit the parties in a criminal matter to be prepared for trial. Trial by ambush is contrary to the spirit and letter of those rules and cannot be condoned.").

21

sentence and deeming waived claim that trial court's erred in denying defendant's alleged spoliation instruction.); *see also, Commonwealth v. Allen*, 24 A.3d 1058, 1062 (Pa. Super. Ct. 2011) (Deeming waived defendant's 1925(b) claim that court should have issued a jury instruction on the issue of spoliation.); *compare Commonwealth v. Williams*, 154 A.3d 336 (Pa. Super. Ct. 2017) (Reversing trial court's suppression of testimony regarding content of lost surveillance video capturing underlying crime, and remanding, after holding that such testimony was admissible, despite defendant being denied opportunity to view.) Though not mandated, the remedy imposed was one of the options posited by Defendant which this Court deemed sufficient under all of the circumstances presented.[47]

## IV.   CONCLUSION

Accordingly, the trial court requests that the judgment of sentence imposed on Defendant, Bryan Monica on July 11, 2018, be AFFIRMED.

BY THE COURT:

THOMAS C. BRANCA,          J.

Copies of the above Opinion
Mailed on: 3/ᵗᶜ /19
**By Interoffice Mail:**
Office of the Montgomery County Public Defender- Appellate Division
Montgomery County District Attorney - Appellate Division
Deputy Court Administrator-Criminal

Secretary

---

[47] *Supra*, note 34.

22